UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

JOSEPH FOLEY and MELISSA FOLEY,
Individually and as Personal Representatives of
the Estate of JOSEPH PARKER FOLEY,

Plaintiffs,

v.

JOHN BLAKE and DUXBURY PUBLIC
SCHOOLS,

Defendants.

Civil Action No. 1:21-cv-10615-ADB

---

## PLAINTIFFS' MOTION TO COMPEL DANIEL KENNEY TO APPEAR FOR DEPOSITION

NOW COME the Plaintiffs, Joseph Foley and Melissa Foley, individually and as Personal Representatives of the Estate of Joseph Parker Foley ("Plaintiffs"), and hereby move this Court to compel Daniel Kenney to appear for a deposition. Daniel Kenney is a current employee of the Defendant Duxbury Public Schools ("DPS"), and he is represented by counsel of record for DPS in connection with this litigation.

Plaintiffs have asserted that their deceased son, Parker, was sexually assaulted and raped by Defendant John Blake ("Blake"), Parker's former gym teacher at the Duxbury Middle School, while Parker was a student in the mid-2000s. Prior to the filing of this litigation, DPS retained an independent investigator to investigate Plaintiffs' allegations. The purpose of the DPS investigation was to determine whether Blake, through his interactions with Parker, violated DPS's Policies and Procedures. In conducting the investigation, the investigator interviewed many of Parker's classmates, school administrators, and teachers, including Mr. Kenney. Because Parker is deceased and there are no first-hand witnesses to the sexual abuse other than Blake, the

investigator weighed all of the evidence, including the interviews of Mr. Kenney and other interviewees, to determine if Blake's denial of the assaults was credible.   The independent investigator concluded that she had "serious concerns" about Blake's credibility and found that the sexual abuse perpetrated by Blake "amounted to unwelcomed conduct of a sexual nature in violation of the School's Harassment Policy." See **Exhibit A**, *Independent Investigator's Report (p. 24)*.

Mr. Kenney taught Parker Foley when Parker was a student at the Duxbury Middle School, and Mr. Kenney has been identified by several witnesses, including the independent investigator, as someone who possesses discoverable information.  In fact, Blake himself identified Mr. Kenney as an individual who possesses "personal knowledge" of Plaintiffs' allegations.  See **Exhibit B**, *Blake's Answers to Plaintiffs' Interrogatories, Interrogatory No. 15.*  During the course of the independent investigation, Blake stated that he had no memory of Parker; however, during Mr. Kenney's interview, Mr. Kenney recalled a conversation in which Blake suggested that he was familiar with Parker.  See **Exhibit C**, *Independent Investigator's Notes from Interview with D. Kenney*.  The independent investigator ultimately determined Blake's claim to have no memory of Parker "to be incredible and likely to be evidence of consciousness of guilt." See **Exhibit A** at p. 21.

As early as December 2021, Plaintiffs advised DPS of their intent to depose Mr. Kenney and requested that DPS provide dates of Mr. Kenney's availability.  On April 26, 2022, after months of not receiving proposed dates for Mr. Kenney's availability, Plaintiffs served counsel for DPS with a Notice of Deposition of Mr. Kenney, which commanded Mr. Kenney to appear for a deposition on May 5, 2022. See **Exhibit D**.  DPS advised that they were unavailable for the noticed

deposition and stated that they would provide alternative dates in May for Mr. Kenney's deposition.

On May 19, 2022, counsel for DPS advised that, at the recommendation of Mr. Kenney's physician, a general practitioner (not a mental health professional), Mr. Kenney would be unavailable to be deposed because of his purported anxiety about being deposed. However, Mr. Kenney does not have a diagnosed medical or mental health condition that would prevent him from testifying, and in fact, DPS has advised that Mr. Kenney is not even on leave from his employment because of his purported anxiety. However, out of respect for Mr. Kenney's purported anxiety about being deposed, but with the understanding that Mr. Kenney possesses information concerning the claims and allegations in this litigation, Plaintiffs' counsel proposed to provide a limited scope of no more than two hours of examination, allowing Mr. Kenney to take as many breaks as necessary. DPS (and Mr. Kenney) did not agree to Plaintiffs' proposal. DPS cannot in good faith prevent Plaintiffs from deposing Mr. Kenney, particularly where he has been identified by several parties, including Blake, and non-parties as someone who possesses discoverable information, and particularly where he has already been interviewed during the DPS investigation concerning this matter in which he offered pertinent information.

On February 3, 2022, this Court granted Plaintiffs' Motion for Leave to Conduct More than Ten Depositions, specifically allowing Plaintiffs to conduct depositions of up to twenty (20) witnesses. See Docket Entry No. 39. To date, Plaintiffs have conducted nineteen (19) depositions, and for months, they have attempted to cooperatively work with DPS to secure a date for Mr. Kenney's deposition. DPS waited until the near end of discovery to raise this particular issue with

Plaintiffs.[1]  Assuming there are no further developments through discovery, Plaintiffs expect Mr.

Kenney to be the final witness they intend to depose in this matter.

Accordingly, where Mr. Kenney possesses information that directly contradicts Blake's

assertions, and where Mr. Kenney has no diagnosed medical condition that would prevent him

from testifying, Plaintiffs respectfully move this Court to compel Daniel Kenney to appear for a

deposition.


Respectfully Submitted,

JOSEPH FOLEY and MELISSA FOLEY,
Individually and as Personal Representatives of the
Estate of JOSEPH PARKER FOLEY,

By their counsel,


DATED:  June 10, 2022

   _/s/_ Jason W. Morgan_____
Jason W. Morgan (BBO #633802)
Drohan Tocchio & Morgan, P.C.
175 Derby Street, Suite 30
Hingham, Massachusetts 02043
Tel:  (781) 749-7200
Fax:  (781) 740-4335
jmorgan@dtm-law.com

---

[1] Discovery is set to close on June 15, 2022, and a status conference is scheduled for June 28, 2022.

## **CERTIFICATE OF SERVICE**

I, Jason W. Morgan, hereby certify that, on June 10, 2022, I caused to be served a true and correct copy of the foregoing, *via* ECF filing, upon the following parties of record:

John J. Davis, Esq.
Pierce Davis & Perritano LLP
10 Post Office Square, Suite 1100
Boston, MA 02109
jdavis@piercedavis.com

Kevin J. Reddington, Esq.
1342 Belmont Street, Suite 203
Brockton, MA 02301
kevinreddington@msn.com


    /s/  Jason W. Morgan
Jason W. Morgan


## **LOCAL RULE 7.1(A)(2) CERTIFICATION**

Undersigned counsel hereby certifies that he conferred with counsel on June 1, 2022 in an attempt to resolve or narrow the issues raised in this motion.

    /s/  Jason W. Morgan
Jason W. Morgan

# <u>EXHIBIT A</u>

# **D**
# **H**
# **S**

# DISCRIMINATION AND HARASSMENT SOLUTIONS

March 1, 2021

### INVESTIGATION OF A COMPLAINT AGAINST JOHN BLAKE
### FINDINGS OF FACTS AND CONCLUSIONS

## I.    SCOPE OF INVESTIGATION

On November 24, 2020, Michael Bolze (hereinafter "Detective Bolze"), a detective for the Duxbury Police Department (hereinafter "DPD"), informed John Antonucci (hereinafter "Superintendent Antonucci"), Superintendent of Duxbury Public Schools (hereinafter "DPS"), that the DPD learned of an allegation of sexual misconduct by John Blake (hereinafter "Mr. Blake"), a physical education teacher for Duxbury Middle School (hereinafter "DMS") and the Duxbury High School boy's hockey coach, against his former student Joseph Parker Foley (hereinafter "Parker"), while he attended DMS. In response to this information, on November 25, 2020, Superintendent Antonucci notified Mr. Blake via Zoom conferencing and followed up by email, that he was being placed on administrative leave, with pay, from his teaching and coaching positions with the DPS, effective immediately, pending the current investigation. (See Exhibit 12)

This investigation addresses whether Mr. Blake through his interactions with Parker violated any of DPS's Policies and Procedures[1]. (See Exhibits 9-11)

---

[1] As the alleged incident occurred prior to August 14, 2020, the current Title IX regulations will not be applied to this investigation.

*Confidential - Personnel*

## II.   SUMMARY OF THE ALLEGATIONS

On February 15, 2018, an anonymous letter addressed to Superintendent Antonucci, Plymouth County District Attorney Timothy Cruz, Duxbury Police Chief Matthew Clancy, and Susanna Sheehan of the Duxbury Clipper alleges that the author's son had been sexually abused by Mr. Blake during the course of his 7th grade year (the "Anonymous Letter") and that the abuse ended only after a "very specific event transpired" between the author's son and Mr. Blake. The author indicated that his son was not prepared to formally press charges for fear of "peer group humiliation," but wished to alert the proper authorities of the threat posed by Mr. Blake to other children.

Additionally, on February 26, 2018, at 1:00 PM, Superintendent Antonucci received an anonymous phone call from an individual who claimed responsibility for the Anonymous Letter.  The individual alleged that the repeated sexual abuse of his son by Mr. Blake occurred during the school day at DMS and added that it only stopped after a violent exchange between his son and Mr. Blake (the "Anonymous Call").

Parker died of an accidental overdose on October 21, 2020. Thereafter, his parents, Joseph Foley (hereinafter "Mr. Foley") and Melissa Foley (hereinafter "Mrs. Foley" and collectively with Mr. Foley, the "Parents"), admitted to Detective Bolze that they had authored the Anonymous Letter and that Mr. Foley had made the Anonymous Call. Moreover, they report that in early 2018, shortly after Christmas, Parker disclosed to them that he had been sexually abused by Mr. Blake while a student at DMS. The Parents report that the abuse occurred during the school day while Parker was a student in Mr. Blake's physical education class. Further, they allege that Parker reported the abuse ended only after a violent exchange at school.

The Parents allege that they have subsequently learned that Parker was in a small physical education class co-taught by Mr. Blake and Carrie Tarpey (hereinafter "Ms. Tarpey") and that he had stolen a knife from his neighbor, Kristofer Andren (hereinafter Mr. Andren), which they believe he used it to threaten Mr. Blake.

Notably, Mr. Blake has been the subject of two former complaints alleging inappropriate conduct towards students and the players whom he coached. In a written letter to Superintendent Antonucci dated July 19, 2017, Brian Cook (hereinafter "Mr. Cook") alleged that Mr. Blake's methods as a Duxbury hockey coach not only represent incompetency, but also border on emotional, psychological, and sexual abuse of his players. (See Exhibit 8) Superintendent Antonucci investigated the allegations made by Mr. Cook, which included his interview of Mr. Blake in September 2017. At the conclusion of his investigation, Superintendent Antonucci concluded that Mr. Cook's complaint was unsubstantiated. (See Exhibit 4)

Additionally, Mr. Blake was the subject of a complaint made by Cara Clelland (hereinafter "Mrs. Clelland") and Tadd Clelland (hereinafter "Mr. Clelland") which alleged that their daughter Charlotte Clelland (hereinafter "Ms. Clelland") was made to feel uncomfortable in physical education class when Mr. Blake had her demonstrate the technique for performing a squat and asked her multiple times to get lower. Following an investigation by this investigator, it was determined that Mr. Blake did not violate the School's policies. (See Exhibit 7)

## III.   EVIDENCE CONSIDERED

### A.   WITNESSES INTERVIEWED

1.  Joseph and Melissa Foley

2.  John Antonucci

3.  John Blake

4.  Sophia DiMartino

5.  Javae Carroll

6.  Colman Duggan

7.  Shira Limmer

8.  Carrie Tarpey

9.  Kristofer Andren

10. Jack Stoddard

11. Carey Fryar

12. Bennett Epstein

13. Daniel Kenney

14. Thomas Holdgate

15. Andrea Schwab

B.      **DOCUMENTS RELIED UPON**

Exhibit 1       February 15, 2018 anonymous letter

Exhibit 2       DCF Report following 2018 anonymous complaint

Exhibit 3       Mr. Blake's administrative leave notice on February 26, 2018

Exhibit 4       Superintendent Antonucci's September 15, 2017 email to Mr.
                Blake

Exhibit 5       Mr. Blake's reinstatement notice on March 2, 2018

Exhibit 6       Scan of page from Parker's notebook

Exhibit 7        DHS Executive Summary of Findings of Fact and Conclusions
                 Made in Connection with an Investigation of a Complaint by Tadd
                 and Cara Clelland Against John Blake

Exhibit 8        Mr. Cook's July 19, 2017 complaint against Mr. Blake

Exhibit 9        DPS 2006 Harassment Policy

Exhibit 10       School AD Vision-Values-Mission-Goals

Exhibit 11       School Staff Conduct Policy

Exhibit 12       Mr. Blake's administrative leave notice November 25, 2020

Exhibit 13       Image of Parker's letter to Sophia DiMartino

Exhibit 14       Scan of Superintendent Antonucci's notes following 2018
                 anonymous complaint

Exhibit 15       Image of Parker's DMS 2005-2006 report card

Exhibit 16       Notes of interview of Mr. Blake on March 1, 2018

C.   **APPENDECIES**

1. Interview of Mr. Blake

2. Interview of Ms. Limmer

3. Interview of Ms. Carroll

4. Interview of Ms. DiMartino

5. Interview of Mr. Duggan

IV.   <u>**SUMMARY OF EVIDENCE**</u>

The following evidence was considered as part of this investigation:

1. Mr. Blake reports that he teaches physical education at DMS and has held this
   position for approximately 25 years. He also coaches the Duxbury High School

boy's ice hockey team and has coached various other teams over the years in both Duxbury and other towns, including but not limited to boys and girls ice hockey, soccer, golf, lacrosse, baseball, and softball. (Interview of Mr. Blake)

2.  On November 25, 2020, Mr. Blake was placed on administrative leave, with pay, as a result of the current investigation. (See Exhibit 12)

3.  Parker was born in March of 1993. He attended DMS from 2004-2007 and was enrolled in Mr. Blake's 7th grade gym class during the academic year 2005-2006 and his 8th grade gym class during the academic year 2006-2007. Parker died of an accidental overdose on October 21, 2020. (Interview of the Parents)

4.  Superintendent Antonucci reports that Mr. Blake has been the subject of two prior complaints, both of which alleged inappropriate conduct towards students and the players he coached. Specifically, in April of 2020, Mr. Clelland and Mrs. Clelland alleged that their daughter, Ms. Clelland, was made to feel uncomfortable in physical education class when Mr. Blake had her demonstrate the technique for performing a squat and asked her multiple times to get lower. Following an investigation, conducted by this investigator, the allegations made by Mr. and Mrs. Clelland were deemed insufficient to support a violation of the DPS's policies. (Exhibit 7)

5.  In a written letter to Superintendent Antonucci, dated July 19, 2017, Mr. Cook alleged that Mr. Blake's coaching methods as DPS's hockey coach not only demonstrated incompetency, but also bordered on emotional, psychological, and sexual abuse of his players. He claims: "Former players describe a painful experience, but few will detail beyond a sense of humiliation about what

transpired. Much of that humiliation involved berating players usually while naked." (See Exhibit 8)

6. By letter dated September 15, 2017, Superintendent Antonucci notified Mr. Blake of the allegations against him regarding inappropriate conduct related to his coaching practices and treatment of players, as described by Mr. Cook. (Exhibit 4)

7. Following an investigation conducted by Superintendent Antonucci, the allegations brought by Mr. Cook in the complaint against Mr. Blake were found to be unsubstantiated. (Interview of Superintendent Antonucci)

8. On February 15, 2018, the Parents sent the Anonymous Letter to Superintendent Antonucci, Plymouth County District Attorney Timothy Cruz, Duxbury Police Chief Matthew Clancy, and Susanna Sheehan of the Duxbury Clipper reporting Parker's allegation that Mr. Blake sexually abused him while a student at DMS. The Parents also noted in the Anonymous Letter that their son was receiving counseling for the trauma caused by the sexual abuse. (Exhibit 1)

9. In compliance with Massachusetts law, immediately upon receiving the Anonymous Letter, the DPD filed a written report to the Department of Children and Families. (Exhibit 2)

10. By a letter dated February 26, 2018, Mr. Blake was notified by Superintendent Antonucci that he was being placed on administrative leave, with pay, pending an investigation into allegations that included, but were not limited to, inappropriate conduct with a student. Superintendent Antonucci's letter further informed Mr.

Blake that he was required to attend a meeting on March 1, 2018 at the District Central Office. (Exhibit 3)

11. On February 26, 2018, at 1:00 PM, Mr. Foley made the Anonymous Call to Superintendent Antonucci and reported that his son had come to him after Christmas in early 2018 and reported being sexually abused by Mr. Blake during the school day at DMS. Mr. Foley reported that his son stated that Mr. Blake engaged in "physical roughhousing" towards him that led to inappropriate touching of a sexual nature. He further informed Superintendent Antonucci that his son had reported to him that there had been a violent exchange between him and Mr. Blake that ended the sexual abuse. Mr. Foley also indicated to Superintendent Antonucci that he believed his son one hundred percent. (Exhibit 14)

12. At the District Central Office meeting on March 1, 2018, ,Mr. Blake was questioned about the allegations made in the Anonymous Letter. Mr. Blake denied engaging in any form of physical roughhousing with or inappropriate touching of any student and claimed that his interactions with students were almost exclusively verbal. Further, Mr. Blake questioned the timing of the anonymous complaint and suggested that it might have been a product of frustration following the failure of the Duxbury High School ice hockey team, which he coached, to make the State Tournament. He claimed that Mr. Cook's complaint was also likely brought for this same reason. (Exhibit 16)

13. By letter dated March 2, 2018, Superintendent Antonucci notified Mr. Blake of his reinstatement to work, which was effective March 5, 2018. In this letter,

Superintendent Antonucci explicitly reserved the right to re-open the investigation in the event that additional information, substantiating the Anonymous Letter, became available. (Exhibit 5)

14. The Parents report that in early 2018, shortly after Christmas, their son Parker disclosed to them that Mr. Blake had sexually abused him, while he was a student at DMS.  They describe him as being upset when he shared with them that the abuse ended in a violent exchange between Parker and Mr. Blake. The Parents claim that they tried to encourage Parker to talk about it further, but he would not provide any more details. (Interview of the Parents)

15. The Parents further explain that Parker expressed his desire not to go to the police and press formal charges because he did not want to be known as the child that was molested. In fact, they never told him that they sent the Anonymous Letter to Superintendent Antonucci, the DPD, and the Duxbury Clipper. (Interview of the Parents)

16. After Parker died, Mr. Foley reports that he discovered a notebook in Parker's apartment.  He produced a page from the notebook that appears to depict a chart in which Parker kept an account of those whom he resented in his life and why. Mr. Blake is one of only five people listed in this chart, and there is a notation of "molested" as the reason for his resentment for Mr. Blake. (Exhibit 6)

17. The Parents also learned that in the 7th grade, Parker was in a small physical education class with only two other boys, one being Colman Duggan (hereinafter Mr. Duggan). The class was co-taught by Mr. Blake and Ms. Tarpey. The Parents claim that they learned from speaking with others who were close to Parker that

the abuse occurred during physical education class when Ms. Tarpey would run

the class and Mr. Blake would remain in his office. (Interview of the Parents)

18. Parker engaged in a dating relationship with Javae Carroll (hereinafter "Ms.

Carroll") between the years of 2014 and 2018. Ms. Carroll reports that during

their relationship, Parker was anxious, avoidant, and struggled with intimacy. She

shares that Parker ultimately admitted to her that Mr. Blake molested him while in

middle school and that it often happened in the locker room during gym class. She

reports that the first few times this occurred, Parker was changing alone in the

locker room and going to the bathroom when Mr. Blake came up behind him and

fondled his penis and anus. As this act increased in frequency, Mr. Blake

allegedly began to ask Parker to touch him back. Ms. Carroll reports that Mr.

Blake anally raped Parker on approximately 5 different occasions. Ms. Carroll

asserts that she is unequivocal in her belief that Parker was telling her the truth

when reporting this sexual abuse. (Interview of Ms. Carroll)

19. Ms. Carroll alleges that the abuse ended after Parker brought a knife to school and

threatened Mr. Blake. (Interview of Ms. Carroll)

20. Ms. Carroll reports that the first time Parker told her about the molestations, he

was on the ground in a fetal position and was completely immobilized. She shares

that she is now a therapist and in hindsight recognizes that Parker's trauma

manifested itself in obvious ways. He was very specific about the way he allowed

her to touch him and wouldn't allow her to touch him playfully, especially near

his buttocks. Moreover, she describes him as a jumpy person, prone to being

startled, and reports that he would get angry when he was startled. Ms. Carroll

further notes that over the course of their relationship and in his past relationships, Parker struggled with sexual anxiety and performance issues related to getting and staying erect during intercourse. She attributes this to intrusive thoughts and emotional trauma stemming from the sexual abuse. Lastly, Ms. Carroll adds that Parker felt his drug use was a coping mechanism linked to the trauma of being molested by Mr. Blake. He began smoking weed heavily in the 7th grade and ventured into other substances from there. (Id.)

21. Ms. Carroll also recalls times when Parker expressed so much rage towards Mr. Blake and his desire to return to Duxbury and inflict violence on him, specifically by beating him with a baseball bat. Ms. Carroll notes that despite this expression of anger, Parker never indicated any intention to actually do this. (Id.)

22. Sophia DiMartino (hereinafter "Ms. DiMartino"), who was close friends with Parker since their freshman year of high school, alleges that she had 3-5 conversations with him about his history of sexual abuse. She claims that in 2018, Parker told her that, while he was in the 7th grade, a male gym teacher regularly raped him during the school day. She recalls Parker mentioning that he had been anally raped or forced to perform oral sex on the male gym teacher and when talking of this sexual abuse he mentioned a locker room and being pulled into a separate room. Ms. DiMartino asserts that she believes wholeheartedly that Parker was telling her the truth when reporting this sexual abuse. (Interview of Ms. DiMartino)

23. Ms. DiMartino further reports that Parker informed her that the abuse ended after he snuck a knife into DMS, waited for the male gym teacher to try to rape him, at

which point, he threatened to kill the teacher with the knife if he continued to molest him. (Id.)

24. Ms. DiMartino notes that prior to Parker disclosing to her, in 2018, the specific details about the abuse, she knew when she met him in the 9th grade that he suffered from a deeper trauma that stemmed from his time at DMS. Throughout the course of their friendship, she claims that he referred to a person causing him abuse and that she began to notice signs of trauma that linked back to this. She recalls a time when she played a prank on Parker by jumping up behind him and touching his neck in order to surprise him, which produced an extreme panic response from him. (Id.)

25. Ms. DiMartino also shared that Parker told her that he suffered from sexual anxiety and had a difficult time being intimate with his girlfriends. In particular, he told her that he struggled to stay erect during intercourse. (Id.)

26. Ms. DiMartino also reports that Parker admitted to her that drugs alleviated the pain and trauma stemming from the sexual abuse and that they became a coping mechanism that ultimately led to his severe addiction issues. (Id.)

27. In a letter to Ms. DiMartino, Parker writes he is happy when fantasizing "about who wronged me in my life and beating them to there [sic] death in bed. I want to scream and I can't [sic] I am missing something." (Exhibit 13)

28. Mr. Andren reports that he was a close friend with and next-door neighbor to Parker growing up. His father was a mechanic and kept a knife in the garage, and he recalls showing Parker and other friends the knife because he thought that it was cool at the time. Mr. Andren does not remember if he noticed that the knife

went missing during the time frame of 2005-2006, but he recalls Parker returning the knife to him during middle school. When he asked why he took it, Parker did not explain himself, but he remembers thinking it was "shady" that he took the knife. (Interview of Mr. Andren)

29. Mr. Blake denies all allegations of sexually inappropriate behavior with Parker or any student, including intentionally touching a student on the skin, asking a student to perform oral sex on him, touching a student's genital area, or engaging in anal intercourse with a student. (Interview of Mr. Blake)

30. Furthermore, Mr. Blake denies that anyone, with the exception of Parker in the complaint that forms the basis of this investigation, has ever made an allegation against him of sexually inappropriate behavior. (Id.)

31. At the end of his interview as part of the investigation, Mr. Blake referenced both the complaints by Mr. Cook and by the Clellands and wanted it to be known that both were investigated and determined to be unfounded. Moreover, he alleges that Mr. Cook "had it out for him" as a hockey parent. (Id.)

32. When asked, in his interview as part of this investigation, if a student ever brought a knife to school and pulled it on him, Mr. Blake claimed that he did not recall. When asked if he would likely remember a student pulling a knife on him, he responded that he would "probably" remember if it had occurred. When asked again to confirm that a student never pulled a knife on him, he responded "correct—to my knowledge." (Id.)

33. Mr. Blake claims that he has no recollection of having had a student in his class named Parker and that, to this day, he has no recollection of Parker Foley. He

recalls hearing the name during lunch duty in the fall of 2020 when a group of his colleagues, including Shira Limmer (hereinafter "Ms. Limmer"), mentioned that he passed away and was a former DMS student. He did not recognize Parker's name during this conversation and claims to never have heard it before this point in time. (Interview of Mr. Blake).

34. Ms. Limmer recalls a conversation between a group of staff members, including Mr. Blake, Daniel Kenney and Lori Bennett, about the death of a former DMS student. Upon identifying the student as Parker, she claims that Mr. Blake explicitly expressed that he did not remember him. (Interview of Ms. Limmer)

35. Mr. Duggan was a close friend with Parker throughout middle school. Mr. Duggan reports that he was in a physical education class with Parker in 7th or 8th grade and that the class was co-taught by Ms. Tarpey and Mr. Blake. Notably, he adds that there were only 3 boys in this class—Parker, their classmate KC, and himself. Mr. Duggan also notes that Ms. Tarpey seemed to be the primary teacher and that Mr. Blake would occasionally substitute for her. (Interview of Mr. Duggan)

36. During the academic year 2005-2006, DMS physical education teacher Ms. Tarpey remembers co-teaching an unusually small physical education class with Mr. Blake. Ms. Tarpey recalls Parker as a student in the class but does not remember if she was his rostered teacher. (Interview of Ms. Tarpey)

37. Parker's 7th grade report card, dated 2005-2006, lists Mr. Blake as his physical education teacher for Q3 and Q4 of the academic year. Mr. Blake awarded Parker

an "A" and an "A-" for Q3 and Q4, respectively, and typed in the comments section, "Conduct Good, Effort Good, Is doing a good job." (Exhibit 15)

38. All other teachers on the report card report "Conduct good" and "Effort good," but on Parker's physical education grade there is the added memo of "is doing a good job." (Id.)

39. Ms. Tarpey claims that she likely would have graded the class but that it would have gone through Mr. Blake's grading system. She notes that when co-teaching a class, both teachers would communicate their observations about each student and reach an agreement about a grade reflective of both of their observations. (Interview of Ms. Tarpey)

40. Mr. Blake concurs with the aforementioned grading practice and adds that he and Ms. Tarpey were highly unlikely to disagree on the grade that a particular student deserved. (Interview of Mr. Blake)

41. Ms. Tarpey claims that when co-teaching a class, if she was teaching a particular unit, Mr. Blake would be in his office, and vice versa. Occasionally, they would teach a unit together, like volleyball. (Interview of Ms. Tarpey)

42. Although Mr. Blake agrees that he and Ms. Tarpey took the lead on certain units based on their strengths, he claims that the expectation when co-teaching a class was always to be in the gymnasium with the class. He admits the possibility of either teacher being in the office on occasion but states that they always tried to be in the gymnasium with the class when they were on assignment. (Interview of Mr. Blake)

43. Summarizing the locker room procedures before physical education class, Mr. Blake alleges that he would not critique the students for inappropriate exercise clothes inside the locker room. Rather, he would do this out in the gymnasium during attendance. Moreover, Mr. Blake claims that it was not his practice, to hold a student behind in the locker room or send them to school administration due to improper attire. Instead, he would require them to sit on the bleachers for the duration of the class period. If a student had to use the restroom, they were required to ask a teacher and then go to the restroom alone. In the event that they needed to be checked on or if there was ever an issue, another student would be sent into the bathroom. A teacher would never go. (Interview of Mr. Blake)

44. Mr. Duggan recalls that the only place in which they would interact with Mr. Blake was in the locker room. He showed Mr. Duggan, Parker, and KC—the only 3 boys in the class—how to use the showers and the proper clothes to wear, and he would approve their attire in the locker room before they went into the gymnasium. Mr. Duggan recalls that students were barred from participating if they forgot their gym clothes but does not remember where students would be sent in that situation. Further, he adds that Parker and KC often forgot their gym clothes. (Interview of Mr. Duggan)

45. Both Ms. Tarpey and the other physical education teacher, Jack Stoddard (hereinafter "Mr. Stoddard") report that if a student were not appropriately dressed for class, he would sit on the bleachers. Moreover, Ms. Tarpey has no recollection of seeing Parker on the bleachers during class. (Interviews of Ms. Tarpey and Mr. Stoddard)

46. In the old DMS building, Mr. Blake's office was located in the back of the locker room and contained a window that looked out into the locker room. This was the only office located within the locker room; the office of his colleague, Mr. Stoddard, was located in the adjacent hallway. However, Mr. Blake reports that Mr. Stoddard was often found in the locker room office because it housed the only computer in the physical education department. (Interview of Mr. Blake)

47. Mr. Stoddard agrees that the two shared the office within the locker room because of the computer and further notes that this office lacked privacy. He believes that if something were to happen in the locker room during class, he would have seen it from the office. (Interview of Mr. Stoddard)

48. Mr. Blake alleged that he stayed in his office while the boys got dressed. He further notes that he would periodically look out the window to monitor the locker room. (Interview of Mr. Blake)

49. As a teacher and youth sports coach, Mr. Blake has attended numerous required trainings on bullying and inappropriate behavior, including SafeSport and an NFHS course. Despite these trainings, he admits that he did not implement any formal practices to prevent the appearance of impropriety with students. However, he made an effort to abide by common-sense rules, such as always meeting with a student in a common area or with another teacher present. Nevertheless, students were still allowed to use the bathroom located in the locker room alone if he was in his office. (Id.)

50. Ms. Tarpey reports that she is surprised by the allegations against Mr. Blake and notes that he tended to keep a radius around himself to remain distant from

students. She says that if he was ever in his office, the doors were open. Moreover, she believes that there is "no way" he would keep a student behind in the locker room and would want them all out in the gymnasium. (Interview of Ms. Tarpey)

51. Mr. Stoddard also claims that Mr. Blake drew boundaries and never got close to students, not even to give a high-five. Further, he adds that he has never seen Mr. Blake exhibit any inappropriate or suspicious behavior and cannot imagine him committing the act for which he is accused. (Interview of Mr. Stoddard).

52. Mr. Blake and Mr. Stoddard have been friends for 25 years, coached golf, and ran an after-school program together. Both of Mr. Stoddard's sons have worked for Mr. Blake and are fond of him. (Id.)

53. Mr. Duggan alleges that as a student at DMS, Parker had a target on his back because he was not a diligent student and tended to irritate teachers. He characterizes Mr. Blake as a strict, no-nonsense type of person. (Interview of Mr. Duggan)

54. After Parker's death, Mr. Foley reports that he contacted Ms. Tarpey because Mr. Duggan identified her as the co-teacher of Parker's gym class. Ms. Tarpey told him that Mr. Blake was having an affair with a staff member and that they would have sexual relations in her office. (Interview of Mr. Foley)

55. Ms. Limmer admits that she had a sexual relationship with Mr. Blake that started in 2002 and lasted "on and off" for a few years but denies having sexual relations with him in Ms. Tarpey's office. She further remembers Ms. Tarpey accusing her

of having sexual relations with Mr. Blake in her office, and she confronted Ms. Tarpey about this and called her a liar. (Interview of Ms. Limmer)

56. When asked as part of his interview for this investigation if he was ever engaged in a dating or sexual relationship with Ms. Limmer, Mr. Blake responded, "Not to my knowledge." Further, when asked if he had sexual relations with Ms. Limmer at any DPS property, Mr. Blake responded, "Not to my knowledge." (Interview of Mr. Blake)

57. Ms. Limmer reports that she engaged in a sexual relationship with Mr. Blake outside of school for a few years, and it ended when he got married. (Interview of Ms. Limmer)

58. Ms. Tarpey, Mr. Stoddard, and Ms. Fryar, the previous librarian and math teacher at DMS, claim that they were aware that Mr. Blake and Ms. Limmer were in a relationship.

59. The School's Harassment Policy from 2006 defines sexual harassment as follows:

"Sexual harassment includes sexual advances, requests for sexual favors, and/or other verbal or physical conduct of a sexual nature when:

1.   acceptance of or submission to such conduct is made either explicitly or implicitly a term or condition of employment or education, or

2.   the individual's response to such conduct is used as a basis for employment decisions affecting an employee or as a basis for educational, disciplinary, or other decisions affecting a student, or

3.   such conduct interferes with an individual's job duties, education, or participation in extracurricular activities, or

4.   the conduct creates an intimidating, hostile or offensive work, or school

environment." (Exhibit 9)

60. The School AD document titled "Vision-Values-Mission-Goals" lists the
following as the core values of Duxbury Public Schools' employees:

> 1. Take personal responsibility
> 2. Act with integrity
> 3. Respect self and others
> 4. Embrace diversity
> 5. Take pride
> 6. Actively learn
> 7. Foster hard work and discipline
> 8. Cultivate and sustain collaborations that promote learning and team work
> 9. Continuous improvement
> (Exhibit 10)

61. The School document "Staff Conduct" states:

> All staff members have a responsibility to familiarize themselves with and
> abide by the laws of the State as these affect their work, the policies of the
> School Committee, and the regulations designed to implement them. In the
> area of personal conduct, the Committee expects that teachers and others
> will conduct themselves in a manner that not only reflects credit to the
> school system but also sets forth a model worthy of emulation by students.
> (Exhibit 11)

## V.   **FINDINGS AND CONCLUSIONS**

Having considered all the evidence and reasonable inferences drawn therefrom
and giving the appropriate weight thereto, based on a preponderance of the evidence, I
make the following findings of fact and conclusions:

Where Parker is deceased and there are no first-hand witnesses to the alleged
sexual abuse, other than Mr. Blake, Mr. Blake's credibility in denying the allegations is

critical to these findings and conclusions. Quite simply, if Mr. Blake's denial is credible, then this investigation is resolved with a finding that he did not sexually abuse Parker. Unfortunately, it is not that simple, as I have serious concerns regarding Mr. Blake's credibility.

First, I find that Mr. Blake lied about his sexual relationship with Ms. Limmer, a relationship that had lasted for years, was acknowledged by Ms. Limmer, and of which Mr. Stoddard, Ms. Tarpey, and Ms. Fryar were all aware. I find this lie to be particularly troubling given the nature of this investigation, which involves allegations that he had engaged in sexually inappropriate behavior with a student.

I also find his claim to have no memory of Parker Foley to be incredible and likely to be evidence of consciousness of guilt. The credible evidence suggests that Parker stood out from most of the students at the Middle School and made a distinct impression on Mr. Blake. In making this finding, I note the uniqueness of Parker's name and consider the credible statements of Mr. Duggan, who characterizes Parker as a student who had a target on his back with teachers because he was not a diligent student and tended to irritate teachers and who characterizes Mr. Blake as a strict, no-nonsense type of person. I further consider Mr. Duggan's credible statement that Parker regularly forgot his gym clothes and was not allowed to participate in gym class.  Finally, it is noteworthy that Mr. Blake had Parker in his class for two years and that despite his regular inability to participate in class due to his inappropriate attire, Mr. Blake always graded him as an "A" or "A-" student and, on one occasion, included the notation "doing good" on his report card. I also consider his reaction in front of several teachers upon

hearing of Parker's death, as reported by Ms. Limmer, that he explicitly expressed that he did not remember him as further evidence of consciousness of guilt.

I also found Mr. Blake to have been oddly evasive when questioned about the critical issue of whether a student pulled a knife on him. He initially responded that he did not recall anything of that nature occurring and that he would "probably" remember it if it had happened. Then, when asked again to confirm that a student had never pulled a knife on him, he responded, "Correct—to my knowledge."  It is noteworthy that Mr. Blake responded in a similarly evasive manner when questioned whether he had had a dating or sexual relationship with Ms. Limmer, which Ms. Limmer credibly acknowledges to be true.  He responded: "Not to my knowledge" and when asked if he had had sexual relations with Ms. Limmer at any DPS property, Mr. Blake responded, "Not to my knowledge."

Regarding the other evidence, I credit the statements provided by the Parents and Ms. Carroll that Parker had reported to them that Mr. Blake had sexually abused him during gym class at DMS, as well as Ms. DiMartino's statement that Parker reported having been raped by a male gym teacher in the seventh grade. I credit Mr. Foley's statement that Parker informed him that Mr. Blake had inappropriately touched him, Ms. Carroll's statement that Parker informed her that Mr. Blake fondled his penis and anus while going to the bathroom and anally raped him on approximately 5 different occasions, and Ms. DiMartino's statement that Parker informed her that while in the seventh grade, the gym teacher anally raped him and forced him to perform oral sex. I also credit the Parents' representation that the notebook page that includes a table that lists Mr. Blake next to the notation "molested," appearing under a column titled

"resentment," was taken from Parker's notebook, and I credit Mr. Foley, Ms. Carroll, and Ms. DiMartino that they unequivocally believe that Parker was credible when reporting this sexual abuse.

In considering the opportunity for Mr. Blake to have committed the sexual abuse of Parker during gym class, I credit Ms. Tarpey's statement that she and Mr. Blake took turns conducting the gym class while the other remained in the office throughout the class. I also credit the statements of Mr. Duggan that Mr. Blake inspected the boys' gym clothes before allowing them to enter the gymnasium and that he doesn't know where those who forgot their gym clothes went during gym class, as well as his statement that Parker often forgot to bring his gym clothes and was unable to participate in gym class. I also find it telling that even though both Ms. Tarpey and Mr. Stoddard report that if a student was not appropriately dressed for class, they were required to sit on the bleachers, Ms. Tarpey has no recollection of seeing Parker on the bleachers, despite the fact that he was regularly precluded from participating in class due to his inappropriate attire.

In reconciling Mr. Stoddard's claim that if something were to have happened in the locker room during class, he would have seen it from the office, I find that Mr. Blake could have discretely engaged in touching Parker's privates while in the locker room, without Mr. Stoddard noticing, and that the opportunity for Mr. Blake to have secretly engaged in more aggressive sexual abuse of Parker during gym class existed in locations other than in the locker room. In particular, it could have occurred in Ms. Tarpey's office, which was located just down the hall. As to this possibility, I note Ms. DiMartino's recollection that Parker described being taken to a separate room. This possibility seems all the more likely when considering both Mr. Foley's credible statement that Ms. Tarpey

informed him that Mr. Blake had used Ms. Tarpey's office to have sex with Ms. Limmer and Ms. Limmer's acknowledgment that Ms. Tarpey had in fact accused her of having sexual relations with Mr. Blake in her office.  On this point, I find that Ms. Limmer's denial that she ever had sex with Mr. Blake in Ms. Tarpey's office during their multi-year sexual relationship is likely false and a self-serving effort to avoid the repercussions that would result from an admission to a violation of the DPS policies. Moreover, I find it likely that Mr. Blake would not have been so brazen to engage in anal or oral sex with Parker in the locker room, which was open to students visiting the bathroom during class and teachers, like Mr. Stoddard, who were not engaged in teaching a class and travelled to and from Mr. Blake's office to use the only computer.

I credit the corroborating statement of Mr. Andren that while in middle school, Parker had taken his father's knife, without him knowing. I also credit the statements of Ms. Carroll and Ms. DiMartino that Parker told them that the sexual abuse only stopped when he threatened Mr. Blake with a knife that he snuck into school and the statement of the Parents that the abuse ended only after a violent exchange between Parker and Mr. Blake.

While the sexual abuse perpetrated by Mr. Blake as described by Parker to Ms. Carroll and Ms. DiMartino is far more egregious than that which he described to his Parents, under either account, it amounted to unwelcomed conduct of a sexual nature in violation of the School's Harassment Policy. I reconcile any inconsistency in Parker's descriptions of the sexual abuse by Mr. Blake by inferring that Parker likely found it easier to be fully open with his friends about the abuse than with his parents. Accordingly, I find by a preponderance of the credible evidence that Mr. Blake engaged

in unwelcomed conduct of a sexual nature against Parker while he was a student at DMS in violation of the School's Harassment Policy.

In addition, I find that Mr. Blake violated the Staff Code of Conduct by being untruthful during this investigation in denying a sexual relationship with both Ms. Limmer and Parker, denying any recollection of a student having pulled a knife on him, and denying knowing Parker or having him as a student.

If I may provide you with any additional information, please feel free to contact me.

Very truly yours,

*Regina M. Ryan*

Regina M. Ryan

# **EXHIBIT B**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOSEPH FOLEY and MELISSA FOLEY<br>Individually and as Personal Representatives of<br>The Estate of JOSEPH PARKER FOLEY,<br>     Plaintiffs )<br><br>VS.<br><br>JOHN BLAKE and DUXBURY PUBLIC<br>SCHOOLS,<br>     Defendants ) | C.A. NO. 1:21-CV-10615-ADB |

**DEFENDANT, JOHN BLAKE'S ANSWERS TO INTERROGATORIES**

**INTERROGATORY NO. 1**

Please identify yourself fully, giving your full name, age, social security number, residential

address, business address and occupation.

A.  John Blake, 47 years old.  My social security number is 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.  My residence is 11

Short Street, Canton, MA  02021.  I am presently employed as a part time caddy for

Caddiemaster, Inc. (TPC Boston-400 Arnold Palmer Blvd., Norton, MA.

**INTERROGATORY NO. 2**

Please identify your full employment history, including but not limited to, all names and

addresses of any employers, your title or position, your supervisors and your rate of

compensation.

A.  Duxbury Public Schools, Teacher and Coach (1196-2020), 130 St. George Street,

Duxbury, MA.  The Department Heads were Bill Thomas, Denise Makein and Thom

Holdgate.  I was a salaried employee.

KEVIN J. REDDINGTON • ATTORNEY AT LAW • 1342 BELMONT STREET • BROCKTON, MASSACHUSETTS 02301 • (508) 583-4280/(508) 580-6186

Blue Hill Country Club (1990-2020), 23 Pecunit Street, Canton, MA.  The Department

Heads were Vinnie Del Zoppo, Lou Katsos, Wayne Leal, Ian Kelley and Matt

Cunningham.  My wages were $15.00 an hour as a part time employee.

Boston Junior Huskies (2016-2020), Canton Ice House Rink.  Skills Coach (part time)

My wages were $40-50 per hour.

Caddy for Caddiemater, Inc.  My supervisor was Aeden Ayer.  My wages were $40-$140

per caddy session.

**INTERROGATORY NO. 3**

Please identify and give a full and complete description of any and all training, including but

not limited to, training concerning sexual abuse of minors, that you have received in your

positions as a teacher and/or coach for DPS and/or the Town of Duxbury.

A.  On line onboarding at the beginning of school, professional development during each

school year and online classes for coaching at Duxbury High School.

**INTERROGATORY NO. 4**

Please state whether or not you have ever been disciplined or reprimanded as an employee at

any job, including but not limited to any position you have held with DPS and/or the Town of

Duxbury.

A.  No.

**INTERROGATORY NO. 5**

Identify and describe in detail the layout and/or floorplans of the gymnasium and adjacent

locker rooms of the Duxbury Middle School, including any changes or modifications while

you were teaching at the Duxbury Middle School.

KEVIN J. REDDINGTON • ATTORNEY AT LAW • 1342 BELMONT STREET • BROCKTON. MASSACHUSETTS 02301 • (508) 583-4280/(508) 580-6186

A. Upper Gym, lower gym, mini gym, locker rooms were off the upstairs gym and 3 sets of

doors that were always open/unlocked to enter and exit the locker room.

**INTERROGATORY NO. 6**

Identify and describe in detail any and all conversations you had with Parker while Parker

was a student at the Duxbury Middle School.

A. I have had thousands of students over my career and I do not have a specific memory of

Parker as a student that I had conversation with.

**INTERROGATORY NO. 7**

Please state whether you have ever prepared any written report(s), including report cards,

concerning Parker, and if so, please describe the content of such report, state to whom and

when it was prepared and state the present custodian of the report.

A. The only written documents pertinent to Parker as a student would be for Shared Classes

where the teachers would share user names and passwords for putting in report card

grades.  Teachers would collaborate on students' grades and one teacher would put the

grades in.  I have not prepared any written reports concerning Parker to the best of my

recollection.

**INTERROGATORY NO. 8**

Identify and describe in detail any and all affairs, including but not limited to any sexual

relations, you had with anyone working for the Town of Duxbury and/or DPS, including but

not limited to the identity of the person(s) with whom you had an affair, the date range of any

such affair(s) and the identity of all persons who were aware of any such affair(s).

A. I had an adult relationship with a female teacher while employed at the school.

KEVIN J. REDDINGTON • ATTORNEY AT LAW • 1342 BELMONT STREET • BROCKTON. MASSACHUSETTS 02301 • (508) 583-4280/(508) 580-0180

**INTERROGATORY NO. 9**

With respect to any in-person interaction(s) which took place between you and Parker while

Parker was a student at the Duxbury Middle School, please;

a.   State the time and place of said in-person interaction(s)

b.   State the manner in which you interacted with Parker; and

c.   Identify all persons, besides yourself and Parker, present during each such interactions.

A.   My only interaction with Parker at a student would be in my capacity as teacher and

    student.  I do not have specific memory of time and place of any such interaction, manner

    or other persons who would have been present during such interactions.

**INTERROGATORY NO. 10**

Please state in detail your duties and responsibilities for each position you held as an employee

of the Town of Duxbury.

A.   Teacher grades 3-5, grades 5-8, 6-8, part time teacher grades 9-12 and coach for Duxbury

    High School boys soccer, boys golf and boys hockey.

**INTERROGATORY NO. 11**

Please identify and state in detail any and all complaints that have ever been asserted against

you, by a student, a parent of a student, a teacher, an administrator or any other person

concerning your employment as a teacher or coach with DPS and/or the Town of Duxbury.

A.   To the best of my knowledge the following people have complained about me in my

    capacity as a coach with specific reference to Brian Cook (hockey related), Mrs.

    Clellend (school relates), Mrs. Weiler (hockey related) and other hockey parents.

KEVIN J. REDDINGTON • ATTORNEY AT LAW • 1342 BELMONT STREET • BROCKTON, MASSACHUSETTS 02301 • (508) 583-4280/4281 • FAX 588-4768-040

## INTERROGATORY NO. 12

Please state in detail the manner in which you conducted physical education classes at the Duxbury Middle School, including in your answer;

    a.  The format of each such class, including whether or not the classes were conducted by one or more staff members;

    b.  The layout of the locker room, including where your office was located and where other nearby officers were located;

    c.  The policies regarding attire that students had to wear in order to attend gym classes; and

    d.  The procedures for students who did not bring the mandatory attire for gym class.

    A.  It would depend on the class and number of students on how many teachers per class. Men;s P.E. Office was located in the back of the locker room. Shared office as the only computer for our department was in the office. Jack Stoddard's office was located down the hall. He spent most of his time when he was not teaching in Men's P.E. office. Carrie Tarpey's office was located on the opposite side of the gym. They attended class and participated class regardless of their attire. Students were allowed to participate if they didn't' have proper attire. They would be marked down during attendance for not being changed into activity clothes if they were not in the proper attire.

## INTERROGATORY NO. 13

Please identify every individual that you have had interactions of a sexual nature with on the property of the Duxbury Middle School and describe in detail the nature of the sexual interaction and the place (classroom or otherwise) where such sexual interaction occurred.

    A.  See Answer to Interrogatory No. 8 above.

KEVIN J. REDDINGTON • ATTORNEY AT LAW • 1342 BELMONT STREET • BROCKTON, MASSACHUSETTS 02301 • (508) 583-4280/(508) 588-6147

## INTERROGATORY NO. 14

Please set forth each and every fact and each and every document upon which you rely in

support of your "First Defense."

A. I have a specific recall of Daniel Kenney who was a teacher who had an issue with Mrs.

Foley regarding Parker. I was not privy to the conversation or the complaint. William

Thomas is a former teacher and was arrested on child pornography charges. He may

have had Parker in class during his time in Duxbury.

## INTERROGATORY NO. 15

Please identify each and every witness or person with knowledge of discoverable information

relative to the allegations in the Complaint.

A. To the best of my knowledge the following people would have personal knowledge of

information regarding your allegations. Jack Stoddard, Carrie Tarpey, Thom Holdgate,

Parker's Middle School Guidance Counselors, current teachers I have taught with

including Lori Bennett, Joe D'Andrea and Anne Wargo, Dan Kenney, Denise Makein,

Heather Barnett, Steph Madden and Matt Files (DTA reps).

## INTERROGATORY NO. 16

Identify each person you expect to call as an expert witness at the trial of this action, setting forth

the subject matter in detail on which each such person may be expected to testify; the substance

of all facts about which each such person may be expected to testify; the content of all opinions

to which each such person may be expected to testify; and a summary of the grounds of each

such opinion and the substance of all facts on which such opinions are based.

KEVIN J. REDDINGTON • ATTORNEY AT LAW • 1342 BELMONT STREET • BROCKTON, MASSACHUSETTS 02301 • (508) 583-4280/(508) 586-0186

A.    Expert witness(es) will be disclosed as expert witnesses are not known to the defendant at this point.

**INTERROGATORY NO. 17**

Please identify each and every person with whom you have discussed the allegations of the Complaint with, including the residence and business address of each such person.

A. The identity of the individuals are as follows; Donnie Christenson, Jack Stoddard, Carrie Tarpey, Matt Files, Regina Ryan.

**INTERROGATORY NO. 18**

Describe in detail any and all discussions and communications you have had with Regina Ryan and/or Discrimination and Harassment Solutions, LLC.

A. My only contact with Regina Ryan was in her capacity as an investigator on behalf of the school which is set forth in full detail in her report.

Signed under the pains and penalties of perjury this _____ 8th _____ day of _____ October _____, 2021.

John Blake

*KEVIN J. REDDINGTON • ATTORNEY AT LAW • 1342 BELMONT STREET • BROCKTON, MASSACHUSETTS 02301 • (508) 583-4280/(508) 580-6186*

## *CERTIFICATE OF SERVICE*

I, Kevin J. Reddington, Esq., Attorney for the Defendant, John Blake, hereby certify that I have forwarded Answers to Interrogatories, this date, via regular mail, to;

Attorney Jason W. Morgan
Drohan, Tocchio & Morgan
175 Derby Street, Suite 30
Hingham, MA  02043

Attorney John J. Davis
Pierce, Davis & Perritano
10 Post Office Square, Suite 1100N
Boston, MA  02109


Kevin J. Reddington, Esq.

DATED : October 12, 2021

# EXHIBIT C

Daniel Kenney

Duxbury public

7 years – 8th grade technology

Vaguely remembers a convo – passing in their duties – in separate room – together for a few minutes – 3 minute passing – PF had passed away – drugs but no sure if it was during the convo – when they lose someone -  both expressed familiarity with the student – couldn't swear to the content – can't remember a request for a pix. Both familiar with PF – doesn't recall if either had

# **EXHIBIT D**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JOSEPH FOLEY and MELISSA FOLEY,
Individually and as Personal Representatives of
the Estate of JOSEPH PARKER FOLEY,

          Plaintiffs,

    v.

JOHN BLAKE and DUXBURY PUBLIC
SCHOOLS,

          Defendants.

Civil Action No. 1:21-cv-10615-ADB

## NOTICE OF DEPOSITION OF DANIEL KENNEY

**TO:**    **John J. Davis, Esq.**               **Kevin J. Reddington, Esq.**
        **Pierce Davis & Perritano LLP**     **1342 Belmont Street, Suite 203**
        **10 Post Office Square, Suite 1100**   **Brockton, MA 02301**
        **Boston, MA 02109**             **kevinreddington@msn.com**
        **jdavis@piercedavis.com**

PLEASE TAKE NOTICE that at **1:00 p.m. on Thursday, May 5, 2022**, the Plaintiffs, Joseph Foley and Melissa Foley, Individually and as Personal Representatives of the Estate of Joseph Parker Foley, by their attorney, will take the deposition upon oral examination of **Mr. Kenney** pursuant to the Federal Rules of Civil Procedure, by video and/or stenographic means, before a Notary Public in and for the Commonwealth of Massachusetts, or before some other officer authorized by law to administer oaths at the law offices of Drohan Tocchio & Morgan, P.C., 175 Derby Street, Suite 30, Hingham, Massachusetts 02043.

You are invited to attend and cross-examine.

Respectfully Submitted,

JOSEPH FOLEY and MELISSA FOLEY,
Individually and as Personal Representatives of the
Estate of JOSEPH PARKER FOLEY,

By their counsel,

DATED: April 26, 2022

Jason W. Morgan (BBO #638802)
Drohan Tocchio & Morgan, P.C.
175 Derby Street, Suite 30
Hingham, Massachusetts 02043
Tel:  (781) 749-7200
Fax:  (781) 740-4335
jmorgan@dtm-law.com

**CERTIFICATE OF SERVICE**

I, Jason W. Morgan, hereby certify that, on April 26, 2022, I caused to be served a true and
correct copy of the foregoing, *via* First-Class Mail and email, upon the following parties of record:

John J. Davis, Esq.
Pierce Davis & Perritano LLP
10 Post Office Square, Suite 1100
Boston, MA 02109
jdavis@piercedavis.com

Kevin J. Reddington, Esq.
1342 Belmont Street, Suite 203
Brockton, MA 02301
kevinreddington@msn.com

Jason W. Morgan

-2-